IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FIRST BANKERS CORPORATION, | * |
|     Plaintiff, | * |
|         v. | * |
| |     Civil Action No.: RDB-09-975 |
| THE WATER WITCH FIRE, COMPANY, INC. | * |
| | * |
|     Defendant. | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

Plaintiff First Bankers Corporation ("FBC") brings this action against Defendant The Water Witch Fire Company, Inc. ("Water Witch"). In Count I, FBC seeks a declaratory judgment that the Escrow Agreement executed by the parties terminated by its terms on October 15, 2008, and that FBC no longer has any obligations or potential liabilities in connection with the pertinent funds. In Count II, FBC asserts a breach of contract claim under the Lease and Option Agreement entered into by the parties. Currently pending before this Court is Plaintiff FBC's Motion for Summary Judgment (Paper No. 12) and Defendant Water Witch's Motion for Summary Judgment (Paper No. 20). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated below, FBC's Motion for Summary Judgment (Paper No. 12) is GRANTED and Water Witch's Motion for Summary Judgment (Paper No. 20) is DENIED.

### BACKGROUND

First Bankers Corporation is a business based in Indiana which finances equipment leases by fire companies. Pl.'s Summ. J. Ex. 3, ¶ 1. The Water Witch Fire Company, Inc. is a volunteer fire company which functions in Port Deposit, Maryland. *Id*., ¶ 2. On May 14, 2007,

Water Witch executed a Lease and Option Agreement ("LOA") and an Escrow Agreement, each dated as of April 15, 2007, so that it could lease a "4 Guys Pumper Tanker" fire truck from FBC. *Id*., ¶ 3. Under the LOA, Water Witch was obligated to make annual lease payments of $25,584.62 to FBC from September 1, 2008 until September 1, 2017, although it could terminate the lease early by making all rental payments and paying the "purchase price" set forth in the LOA. Pl.'s Summ. J. Ex. 2, §§ 4.02, 5.03(c) and Ex. E thereto. The LOA contained a provision whereby Water Witch agreed to hold harmless and indemnify FBC against counsel fees and expenses "arising out of or as the result of entering into the LOA, with such obligations to survive the LOA's termination." Pl.'s Summ. J. Ex. 2, § 9.03. The LOA also included an attorney opinion letter affirming that the transaction was valid and enforceable. Pl.'s Summ. J. Ex. 2(B). This opinion letter explained that the LOA complied with certain requirements of the Internal Revenue Service such that a portion of the payments would be exempt from both Federal and Maryland income taxes, and the leasing of the equipment would be exempt from sales, use and personal property taxes. *Id*.

The Escrow Agreement required FBC to deposit funds into escrow that would total at least $200,000 as of March 1, 2008. Pl.'s Summ. J. Ex. 1, §§ 1.03 and 2.04. The Escrow Agreement provides that it would terminate no later than eighteen months from its date, April 15, 2007. *Id*. § 7.07. In May 2007, FBC deposited the required money into escrow, and otherwise performed all its obligations under the LOA and Escrow Agreement. Pl.'s Summ. J. Ex. 3, ¶ 4. As in the LOA, Water Witch consented in the Escrow Agreement that, absent any willful misconduct by FBC, Water Witch would indemnify and hold harmless FBC from any and all expenses, including attorneys' fees. Pl.'s Summ. J. Ex. 1, § 4.02.

On August 27, 2008, Water Witch's counsel sent a letter to FBC indicating that Water Witch had decided to obtain financing from an alternative source.  Pl.'s Summ. J. Ex. 4.  Water Witch did not make any lease payments to FBC, which started to become due on September 1, 2008.  *Id*.  On September 15, 2008, FBC's principal sent Water Witch a notice of default.  Pl.'s Summ. J. Ex. 5.  On October 15, 2008, the same day the Escrow Agreement terminated by its own terms, Water Witch's counsel sent FBC a proposed release explaining that the contract was "a process" which had been "initiated" but remained an "incomplete transaction."  Pl.'s Summ. J. Ex. 7.  On October 29, 2008, FBC responded that "the proposed release is one-sided and unacceptable," and suggested arranging a conference call to reach a global resolution.  Pl.'s Summ. J. Ex. 8.  Water Witch did not respond.  Pl.'s Summ. J. Ex. 3, ¶ 7.  Several tense communications between counsel followed, during which the status of the Escrow Agreement was not settled.

On December 3, 2008 and December 12, 2008, FBC wrote two letters to Water Witch attempting to confirm that Water Witch would abandon all claims under the Escrow Agreement and agree that it had terminated on October 15, 2008 – after eighteen months had passed.  Pl.'s Summ. J. Exs. 10, 12.  Water Witch's counsel replied: "Respectfully, I have no idea 'what you are talking about' . . . . Whatever you do, you proceed at your own peril subject to my client's rights."  Pl.'s Summ. J. Ex. 13.  Despite this adversarial response from Water Witch, on January 15, 2009, FBC removed from escrow principal and accrued interest of $202,122.26, and credited that amount against Water Witch's liability.  Pl.'s Summ. J. Ex. 3, ¶ 8.  On or about April 21, 2009, after more correspondence, Water Witch's counsel sent a letter to FBC declaring that Water Witch "released the $200,000 and accrued interest. . . ."  Pl.'s Summ. J. Ex. 14.

FBC contends that Water Witch's breaches of the LOA and Escrow Agreement have ultimately resulted in a net total of $26,906.86 in damages, calculated as follows:

- $25,584.62      September 1, 2008 rental payment (Pl.'s Summ. J. Ex. 2(E)); *plus*
- $196,398.35     Early termination/purchase option net of September 1, 2008 rental payment (*Id*.); *plus*
- $3,927.67       Pre-payment charge (Pl.'s Summ. J. Ex. 2, § II); *plus*
- $3,118.48       Interest from September 2, 2008 until January 15, 2009 (Pl.'s Summ. J. Ex. 2(E); *less*
- $202,122.26     Escrow funds credited to Water Witch's liability on January 15, 2009 (Pl.'s Summ. J. Ex. 3, ¶ 9).

Pl.'s Summ. J. Ex. 3, ¶ 10.  Additionally, FBC asserts that it is owed reasonable attorneys fees and costs under the LOA and Escrow Agreement.

PROCEDURAL HISTORY

On February 9, 2009, FBC sued Water Witch in the District Court of Maryland for Cecil County, seeking money damages of $24,300.37 based on an "itemized statement and interest worksheet." However, FBC voluntarily dismissed the case after Water Witch filed a request for jury trial, the effect of which would have been to transfer the case to the Circuit Court for Cecil County. FBC filed this action on April 16, 2009 based on this Court's diversity jurisdiction under 28 U.S.C. § 1332. It seeks a declaratory judgment concerning the parties' rights under the Escrow Agreement (Count I) and money damages for Water Witch's breach of the Lease and Option Agreement (Count II). On June 5, 2009, Water Witch filed a Motion to Dismiss (Paper No. 5) in which their primary contention was that FBC failed to show that the amount in controversy was $75,000 or more, as necessary to maintain a federal action under diversity jurisdiction. On July 27, 2009, this Court issued a Memorandum Order denying Water Witch's Motion to Dismiss (Paper No. 7). Specifically, in light of the initial response of Water Witch to the inquiry of FBC, this Court found that the approximately $200,000 in escrow funds was cognizable as an amount initially in controversy, and that accordingly this action was properly

4

within the diversity jurisdiction of this Court. On August 12, 2009, Water Witch filed its Answer (Paper No. 9) to FBC's Complaint, attaching an exhibit entitled "Counter Complaint" which vaguely alleges that FBC engaged in fraud. Discovery having been completed, the parties have now filed the pending cross motions for summary judgment.

## STANDARD OF REVIEW

There is no dispute that the parties are citizens of different states and, as this Court held in its July 27, 2009 Memorandum Order (Paper No. 7), the initial matter in controversy exceeded $75,000. Thus, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Even though this Court possesses jurisdiction, however, federal courts have discretion to decline to exercise jurisdiction over a declaratory judgment action pursuant to the Federal Declaratory Judgment Act ("the Act"), 28 U.S.C. § 2201 and Fed. R. Civ. P. 57. Specifically, the Act provides in part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis added). In this case, there is no question that this declaratory judgment action will serve to declare the rights of the respective parties and resolve the controversy giving rise to the proceeding. Accordingly, this Court will exercise jurisdiction over this declaratory judgment action. *Id.; see also Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937) (finding that 28 U.S.C. § 2201 gives district courts the discretionary authority to grant relief "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.") (internal quotation marks and citation omitted).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-

motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

## ANALYSIS

**I.    Declaratory Judgment (Count I)**

FBC asserts that it is entitled to declaratory judgment that the Escrow Agreement terminated on October 15, 2008, and that FBC has no further obligations or liabilities there under.  The Escrow Agreement provides that:

> This Agreement shall terminate upon disbursement by the Escrow Agent of all moneys held by it hereunder, but not later than eighteen (18) months after the date of this Agreement.

Summ. J. Ex. 1, § 7.07.  Since FBC retained funds in escrow until January 15, 2009, the Escrow Agreement terminated on October 15, 2008 – eighteen months after its date of April 15, 2007. Notably, although Water Witch initially threatened legal action on the Escrow Agreement in December 2008, it has more recently conceded that it "released the $200,000 and accrued interest" in the escrow account.  Pl.'s Summ. J. Ex. 14.  Water Witch offers no admissible evidence disputing these facts.  Accordingly, FBC's Motion for Summary Judgment seeking declaratory judgment must be granted as to Count I.

**II.    Breach of Contract (Count II)**

FBC alleges that Water Witch is liable to it for a net $26,906.86 in damages for breaching the LOA.  Water Witch claims that when the parties executed the LOA, FBC knew "that [Water Witch] was utilizing FBC as one of several alternatives for the acquisition of the fire equipment," and thus Water Witch owes FBC nothing since it never used the escrow funds for purchase of the equipment.  Def.'s Opp. at 2.  In Maryland, the "clear and unambiguous language of the agreement will not give away to what the parties thought the agreement meant or intended it to

mean." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). Water Witch does not contend that the LOA was unclear or unambiguous. The LOA, which is clearly dated April 15, 2007, plainly states that:

- FBC performed all of its obligations under the contract;
- Water Witch was obliged to begin making payments in accordance with the LOA's Schedule of Payments; and
- Water Witch's payment obligation would not be abated through accident or unforeseen circumstances.

Pl.'s Summ. J. Ex. F. Furthermore, Water Witch has not presented any evidence to support its allegation that the parties' had a different understanding than what was indicated under the LOA. If anything, the evidence Water Witch provides supports FBC's argument. For example, Water Witch submits an August 19, 2008 letter announcing: "[W]e want to cancel this loan as of August 19, 2008, and understand that . . . we will be responsible for the interest accrued to date, ($9,922.13)." Def.'s Opp. Ex. 2. Finally, there is no dispute that FBC deposited the promised sum into escrow in May 2007, as it was obligated to under the LOA. Pl.'s Summ. J. Ex. 3, ¶ 4. Thus, there is no genuine issue of material fact that the LOA was a legally binding agreement, and that Water Witch breached this agreement. Accordingly, FBC's Motion for Summary Judgment must be granted as to Count II, and Water Witch is obligated to pay FBC damages of $26,906.86. Pl.'s Summ. J. Ex. 3, ¶ 10.

### III.    Attorney's Fees

FBC claims that both the LOA and Escrow Agreement contain express provisions entitling it to costs and reasonable attorney's fees as the result of this litigation. In response, Water Witch argues that the section regarding attorney's fees in the LOA "does not deal with a situation such as breach." Def.'s Opp. at 3-4. Water Witch also contends that FBC cannot enforce the Escrow Agreement's fee-shifting provisions because FBC is not the Escrow Agent.

*Id.* The LOA expressly entitles Water Witch to "counsel fees and expenses" incurred "arising out of or as the result of entering into the LOA." Pl.'s Summ. J. Ex. 2, § 9.03. This language is broad enough to include the situation at hand involving Water Witch's breach. Additionally, while FBC did substitute First Indiana Bank as Escrow Agent after the Escrow Agreement was executed, it was permitted to do this by § 6 of the Escrow Agreement, and First Indiana Bank assigned the Escrow Agreement back to FBC on September 19, 2009. Pl.'s Response Ex. 1, ¶ 2. Thus, FBC is the Escrow Agent and is contractually entitled to an award of its costs and reasonable attorney's fees under the LOA and Escrow Agreement. Counsel for FBC shall submit a petition for costs and reasonable attorney's fees within fifteen days of the Order that follows. Any opposition by Water Witch to said fees and costs must be filed within fifteen days thereafter.

## IV.    Water Witch's Counterclaim

Water Witch brings a Counterclaim against FBC alleging that it engaged in fraud. Water Witch's sole evidence in support of its allegation is the legal opinion letter attached to the LOA which indicates that the LOA is valid. *See, e.g.* Pl.'s Summ. J. Ex. 6. Water Witch's own actions contradict this argument. On May 18, 2007, Water Witch received and accepted the loan package that included this legal opinion letter providing Water Witch with certain tax treatment benefits. Pl.'s Summ. J. Ex. 3, ¶¶ 2-3. Water Witch did not express any doubt as to the validity of this letter until over a year later, when it attempted to deny its obligations under the LOA and Escrow Agreement. Pl.'s Summ. J. Ex. 3, ¶ 3. Moreover, Water Witch does not specify how this alleged fraud caused any compensable damages. Accordingly, FBC is entitled to summary judgment on Water Witch's Counterclaim.

For the reasons stated above, FBC's Motion for Summary Judgment (Paper No. 12) is GRANTED and Water Witch's Motion for Summary Judgment (Paper No. 20) is DENIED.

A separate Order follows.

Dated: February 4, 2010                                /s/_____
                                                       Richard D. Bennett
                                                       United States District Judge